```
UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
In re

BATAVIA NURSING HOME, LLC                         Case No. 11-13223 K

                        Debtor
------------------------------------------------------------------    (Jointly Administered)
In re

GERIATRIC REALTY CORP.                            Case No. 11-13225 K
                        Debtor
------------------------------------------------------------------
MELANIE L. CYGANOWSKI, Chapter 11 Trustee

                        Plaintiff
            -vs-                                  AP No. 12-1145 K

JEFFREY LAPIDES
                        Defendant
------------------------------------------------------------------
```

## OPINION, DECISION, AND ORDER DENYING MOTION TO DISMISS, IN PART

Lee E. Woodard, Esq.
Harris Beach PLLC
333 West Washington Street, Suite 200
Syracuse, New York 13202

Attorney for Plaintiff

Gregory Photiadis, Esq.
Duke, Holzman, Photiadis & Gresens, LLP
1800 Main Place Tower
350 Main Street
Buffalo, NY 14202

Attorney for Defendant

William Savino, Esq.

Bernard Schenkler, Esq.
Damon Morey LLP
The Avant Building
200 Delaware Avenue, Suite 1200
Buffalo, NY 14202-2150

Attorneys for Defendant

By separate decision this Court has dismissed the Complaint as to the $1.179 million buyout of the Defendant's stock in the Debtor LLC, by virtue of the safe harbor contained in 11 U.S.C. § 546(e). Consequently, the Defendant's "innocent absentee" defense need not be considered as to that portion of the Complaint. However, the "innocent absentee" defense is asserted as to other causes of action contained in the Complaint. The purpose of the present decision is to deny the Motion to Dismiss to the extent that it is premised upon the "innocent absentee" argument in connection with any of the remaining causes of action of the Complaint. The crux of the Defendant's argument is that he was prejudiced by the fact that at the time the nursing home was sold he was unaware that he would be sued after the sale. It is argued that had he known that, he might have purchased the nursing home himself, as discussed below.

He asserts that although the Second Circuit Court of Appeals in the case of *Adelphia Recovery Trust v. HSBC Bank, et al.,* 634 F.3d 678 (2nd Cir. 2011) reversed an earlier holding by the present Court, it did not cast doubt upon certain *dicta* expressed by the present Court. Indeed, the Circuit's holding was consistent

with that *dicta*.

DISCUSSION

In the case of *In re Niagara Frontier Hockey LP, et al.*, this Court approved the § 363 sale of all assets of the Buffalo Sabres Hockey Club and its affiliates to an arms-length third-party buyer. The sale was "free and clear." Later, certain banks were sued in another district (the Southern District of New York) within the Chapter 11 case of Adelphia Communications on the premise that Adelphia funds ($34 million) were used to purchase those banks' loan claims (secured by the hockey club and its affiliates) at a price that was "unreasonable" under the fraudulent transfer statutes of the State of New York. The banks commenced a declaratory judgment action here in response to having been sued in the Adelphia court. They argued that various orders of this Court in connection with the sale and with confirmation of a plan, barred the lawsuit against them in the Adelphia court. With the permission of the Adelphia court this Court fully heard that matter. In the course of deciding it, this Court articulated the notion that is raised by the Defendant here. The notion was a hypothetical set in terms of John Rigas, the former principal of Adelphia, who is now serving a term in prison for misuse of Adelphia funds.

It was somewhat along these lines. If John Rigas had been driving along a country road in New York and saw a pleasant farmhouse that he decided to preserve

by use of Adelphia funds, and paid the widow who owned it and lived in it a high price with Adelphia funds,[1] should she be concerned later when she reads in the newspaper that Adelphia has gone into bankruptcy and that her former homestead was to be resold "free and clear" to a third-party buyer?  Presume that the sale from her to an Adelphia affiliate occurred three or four or five years before the Adelphia bankruptcy filing. (The Statute of Limitations as to fraudulent transfers in the State of New York is six years.) She reasonably concluded that she needn't be concerned about the fact that her old homestead was to be resold.  After that bankruptcy sale, however, she is sued by the representatives of Adelphia (which was still within its two-year statute of limitations period under § 546).  It is alleged that Adelphia paid too much money to her for the farmhouse.  This Court stated in *dictum* that it would protect such an "innocent absentee" from such suit because although her absence from the sale was reasonable, the sale "free and clear" left her without the ability to rescind the sale and regain her homestead.

In the declaratory judgment action, the banks claimed that they were innocently absent at the time of the sale of the Sabres' assets, because the loans that they had, and that were secured by those assets, had been purchased by Adelphia three or more years before the Sabres' bankruptcy filing.  They thought themselves to

---

[1] Rigas was known to have been community-minded when Adelphia was closely-held by the Rigas family.  For example, he built a public golf course in Adelphia's home town of Cowdersport, Pennsylvania, using corporate money.  But after Adelphia became publicly traded, he did not make the necessary change in his use of corporate assets.

have had no interest that could be affected by the sale of their former collateral.

Critically, at the hearing upon the sale of the assets here this Court asked Adelphia's legal representative (who supported the sale on Adelphia's behalf) whether "we were lacking the consent of anyone whose interests would be affected by the sale." That representative did not inform the Court that (1) the two year statute of limitations for "avoiding actions" had not yet passed in the Adelphia case, (2) that the avoidance analysis was not complete, and (3) that parties whose former lending position relative to the Sabres' assets had been bought out with Adelphia funds might become defendants.

Ultimately, the Circuit ruled that the fact that that particular legal representative might not have known those things (because a different law firm was performing the avoidance analysis, etc.) was irrelevant. "Judicial estoppel" rests upon the knowledge of the <u>client</u>, not the lawyer. Thus, Adelphia's silence in response to the Court's inquiry was fatal to its later fraudulent transfer action against the banks.

At the (earlier) trial level, this Court had ruled that the banks' absence from the sale hearing was <u>not</u> "innocent" because the banks had failed to establish to this Court's satisfaction that their "take-out" with Adelphia funds had ever been fully consummated. The banks did, however, persuade the Court of Appeals that there was no reason for the banks to have been present at the sale.[2]

---

[2]The interest which Rigas caused Adelphia to purchase from the banks was a "junior participation" in an existing loan facility. Although the banks assured this Court that that interest had "ripened" into full ownership of the loans, they could point to no document manifesting such "ripening." The Court of Appeals,

In the present case the Defendant seeks to bring himself within the protective cloak that this Court said it would provide to one who is innocently absent from a § 363 sale, but who suffers injury as a result of the sale. As noted above, he argues that if he had known that he would later be attacked by the Chapter 11 Trustee, he might have chosen to purchase the nursing home himself. (Under terms that would have included a "release," one would presume.)

Of course it is easy to see that the Second Circuit's decision in Adelphia has no application here. (1) The primary injury to the banks caused by the sale of the Sabres franchise, etc. was the fact that it placed their former collateral out of their reach if the sale of their loan position to Adelphia were to be undone. Here, to the best of the Court's knowledge, the Defendant had no recourse to the assets that were sold under the auspices of this Court. He was simply a shareholder and officer before the buyout, and the buyout was in full, in cash, not on an instalment basis secured by the assets of the Debtor.

(2) There was a degree of "misdirection" in Adelphia that was "material," and no such misdirection is present here. There were two Chapter 11s in that matter (effectively[3]) and the Sabres' asset sale here in this District left the banks without recourse if their buyout by means of Adelphia funds were to be set aside in another case in another district. The banks obviously knew (from extensive media coverage,

---

however, accepted the bank's proffer of the "ripening."

[3] Actually, there were ten cases here, and more than twenty cases in the Adelphia court.

though not from some sort of official or record notice) that their former collateral was being sold <u>here</u>, but they did not know that they were about to be sued <u>there</u>. There is no such complexity in the case at bar. There is no worthy claim by the Defendant that he was unaware of the financial demise of the Debtor, of the sale of its assets, and of the fact that the Trustee in this Debtor's case <u>might</u>, at some point, target him.

For at least those two reasons, the Circuit decision in Adelphia is not applicable here. But if the "innocent absentee" proposition ever had any vitality at all, it was not affected either way by the Circuit's decision. Consequently, the Court will now explain why the Defendant here does not fall within the protective cloak of that proposition.

First, in the hypothetical, the widow who owned the farmhouse knew nothing about Adelphia other than the fact that the purchase check came from it. Here, on the other hand, there was an "Operating Agreement" under which the Defendant was to be actively involved in the operation of the Debtor. Because of the standards that govern a Rule 12 Motion, it must be presumed, for current purposes only, that the Defendant obeyed his contractual duties under that agreement (as the Trustee has argued).

In other words, the hypothetical widow was so completely removed from the financial affairs of Rigas and Adelphia that her absence from the hearing at the bankruptcy resale of her former homestead was totally understandable, and therefore "innocent." If she had been on notice that that resale would open her to challenge

without any possibility of her saying "Fine!  Give me back my house and I will refund the purchase price," she might have appeared in Court and said exactly that.  But the Defendant here was not so removed from the financial affairs of the Debtor at the time that he received the buyout amount.  Further, he was chargeable with knowledge of the fact that he was bought out in an LBO, and that LBOs become subject to scrutiny under state fraudulent transfer law if the business entity ends up in bankruptcy within six years (under the New York Statute of Limitations).

Second, and in light of the above, the sale of the nursing home changed nothing, so far as the Defendant is concerned.  He cannot complain of the sale (unlike the widow).  He complains of not being told he might be a target.

Thus, finally, it must be stated that in articulating the notion of the "innocent absentee" it was never this writer's intention to rewrite the Bankruptcy Code or the Rules of Bankruptcy Procedure.  Neither the Code nor the Rules require that notice of a proposed sale of all or substantially all (or any particular portion) of a debtor's assets be given to persons or entities who are not "parties in interest" at the time of the sale, but who (rather), might later become parties defendant in an avoiding action, or an action on an account receivable or other contract, etc.  It is true that some parties who remit money or property to a bankruptcy estate as a consequence of being sued by the estate become creditors as a consequence of such remittance, and thereby become "parties in interest."  But bankruptcy estates are given two years in which to identify such defendants and to commence suit.  Section 363 sales often

occur long before the representatives of the estate have had the opportunity to conduct a sufficient examination of the books and records of a debtor to determine what causes of action may exist and against whom. The reason that the banks in the Adelphia matter were found, in essence, to have been entitled to notice was because this Court specifically asked whether all the necessary consents to the free and clear sale had been obtained; an honest answer would have caused the Court to provide notice to the banks. That proposition is very different from what the Defendant here argues for. He argues for a rule by which a potential defendant in an action by the estate would receive notice of a proposed sale in time for him to make an offer upon terms that would include a release from the estate.

That argument, of course, contemplates a dual-purpose notice: (A) "There will be a sale," and (B) "You might be sued."

Even separately, neither notification is required by the Code or Rules. To require the combination would be a paradigm-shift in the approach to bankruptcy liquidations. No matter how much cash a debtor might be bleeding-out, the § 546 period must be compressed to the period before the sale. Great offers that require a quick sale must be refused if subsequent Chapter 5 actions (likely of unknown value) are to be preserved.

One may easily contemplate evidentiary hearings upon assertions like the Defendant's assertion here. "What did the Trustee know and when did she know it?" as regards the various Causes of Action she now pursues. And upon a trustee's

counter-assertion that "You knew about the sale and knew that you might be sued, whether I sent you that dual-purpose notice or not."

Those might be clear-cut issues for trial in a simple case, but impossible in complex cases. (How could such a rule be obeyed in any of the 100 or 200 of the largest § 363 sales in U.S. history, if the goal of maximizing the estate is to be achieved?)

In any event, what the Defendant seeks cannot be turned into a proposition of law by means of a construct such as the "innocent absentee" proposition.

The Motion to Dismiss is denied to the extent that it relies on the "innocent absentee" proposition or the Adelphia matter.

The remainder of the Defendant's Motion to Dismiss remains under submission.

SO ORDERED.

Dated:    Buffalo, New York
          July 29, 2013

                                                    s/Michael J. Kaplan
                                            _____
                                                    U.S.B.J.

Case 1-12-01145-MJK    Doc 38    Filed 07/29/13    Entered 07/29/13 15:03:15    Desc Main
                        Document      Page 10 of 10